UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ASHLEY VANNIER,                                    Civil Action No: 1:24-cv-324 (DNH/DJS)

                        Plaintiff,

                                                   **JURY TRIAL DEMANDED**

        -Against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SERVICES
And GREAT MEADOW CORRECTIONAL FACILITY,

                        Defendants.
-------------------------------------------------------------------X

## COMPLAINT

        Plaintiff Ashley Vannier ("Plaintiff" or "Vannier"), by his attorneys the Gender Equality

Law Center, brings this Complaint against Defendants New York State Department of Corrections

and Community Services ("DOCCS") and Great Meadow Correctional Facility ("GMCF" or "the

Facility") to remedy violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

("Title VII") and the New York State Human Rights Law, New York Executive Law § 296 *et seq.*

("NYSHRL") for discrimination and harassment based on gender identity.

### INTRODUCTION

1.  Vannier is a thirty-seven-year-old transgender man who worked as a Corrections Officer for

    DOCCS, placed at GMCF, from about 2012 until August of 2022.

2.  At the time Vannier was hired to work at GMCF, he presented as a woman and did not

    experience any workplace problems. However, as soon as Vannier began taking testosterone

    in 2013 and undergoing various surgeries, he encountered hostility and abuse targeted at his

    gender identity as a man. Specifically, after he officially "came out" as male in 2018 and

asked other employees to use male pronouns, they refused to do so and continued to intentionally misgender Plaintiff throughout the rest of his employment with DOCCS.

3. Defendants also refused to change his personnel records to reflect his male gender. The official reason given to Vannier was that because his records stated he was female when he began his employment with Defendants, the records could not be changed. This refusal to acknowledge Vannier's gender transition set a tone throughout the rest of his employment whereby Defendants believed they could misgender Plaintiff and deny that he was a man.

4. Between 2018, when he officially came out as male, and 2022, when he was constructively discharged from his job with Defendants, Vannier was forced to endure, as a term and condition of his employment, repeated offensive insults and slurs targeted to his gender identity. These insults included repeatedly being told he was "not a real man," that he could never change his "female DNA," and that he was "an offense to God."

5. When misgendering Vannier, co-workers and supervisors would also emphasize his prior female pronouns in a taunting and sarcastic tone and laugh when they saw Vannier was upset. Plaintiff was also referred to by such slurs as "add a dick to me," "c*nt," "d*ke," "queer"[1] and "f**got."

6. Supervisors and co-workers not only taunted Vannier, but they sabotaged his locker in the male employees' locker room, filling it with spit and chewing tobacco and writing offensive graffiti referring to Vannier by name next to the words, "d*ke," "queer" and "f**got."

---

[1] While the word "queer" is commonly used by individuals who identify as LGBTQ+ to describe themselves, it has a long history of being used as a slur and is still widely considered to be a slur today, particularly when used by individuals who do not self-identify as LGBTQ+. In this instance, it is clear that the word "queer" was being used in an offensive manner, particularly because it was used in conjunction with other anti-LGBTQ+ slurs such as "f**got."

7. Vannier was also physically threatened, and at least once chased up a flight of stairs, with co-workers or supervisors taunting him because of his gender while threatening him.

8. Vannier's safety was compromised by his co-workers and supervisors, who intentionally revealed to the incarcerated male population that Vannier was assigned female at birth, exposing him to physical danger. When the male population at the Facility learned that Vannier was a transgender man, they reacted in an aggressive and uncooperative manner that sometimes broke out into actions that could lead to violence.

9. Beyond the day-to-day hostility Vannier experienced once he came out as male, he also experienced several adverse employment actions related to his employment as a CO at GMFC. He was denied at least one job opportunity because he was told by his supervisor that he was not a "real man," and had at least one evaluation downgraded after protesting being misgendered repeatedly and intentionally by his supervisor. In addition, he was ordered on more than one occasion to do jobs that were demeaning or even dangerous.

10. Over time, Vannier became increasingly distressed as the mistreatment and abuse on the basis of his gender identity went on unchecked for years; abuse that was frequently instigated directly or on behalf of supervisors at the Facility.

11. Although Vannier complained to his union and directly to his supervisors about the hostile work environment and adverse treatment on the basis of his gender identity, his complaints were ignored.

12. Even the supposedly mandatory LGBTQ+ anti-discrimination trainings conducted on behalf of the DOCCS at the Facility were an occasion for Vannier to be further ridiculed and outed by the trainer.

13. The constant discrimination on the basis of his gender identity over the years took a toll on Plaintiff. Vannier repeatedly felt ashamed, and humiliated. He was anxious every day when he came to work, not knowing what attack he might be forced to encounter.

14. By 2021, Vannier's anxiety had grown to the point where his blood pressure became significantly elevated, although he had no prior cardiovascular issues. Vannier's doctors believed his high blood pressure was directly related to stress, and they were concerned about his health. Plaintiff was placed on a medically ordered short-term medical leave. Only when his blood pressure lowered was he able to return to work.

15. Upon returning to work, the hostility and abuse continued. In turn, Vannier's anxiety and blood pressure continued to increase. In February of 2022, Vannier suffered a heart attack.

16. Plaintiff's doctor told him the heart attack was related to high levels of stress on the job. Vannier had no history of heart-problems before 2022. As a result of the heart attack, Vannier was forced to go out on another, longer medical leave.

17. When Vannier returned to GMCF in or about March of 2022, he faced the same gender-based discrimination and hostility he had experienced before he went out on this post-heart attack medical leave.

18. On or about August 4, 2022, Plaintiff suffered a major anxiety attack after some of his supervisors assigned him a job task that would have placed him in physical jeopardy. When he protested that assignment, he was sent to work out of a room at the GMCF that had not previously been used. That room was plainly (and not exaggeratedly) unfit for any human use.

19. When Vannier told a fellow employee he was going to protest this assignment, his supervisors threatened his future employment with GMCF if he did file a grievance with his union.

20. As a result of being forced to choose between his safety and well-being, and keeping his job, Vannier suffered a serious anxiety attack that day, that included experiencing his heart racing, chest pain, difficulty breathing and feeling dizzy. This anxiety attack forced him to seek immediate medical attention and to be placed on yet another medical leave.

21. Since August 4, 2022, Plaintiff has been unable to work, and DOCCS has terminated Plaintiff's employment.

22. Plaintiff continues to experience anxiety and depression as a result of the treatment he was forced to endure at the hands of Defendants.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over Plaintiff's claims under Title VII pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's NYSHRL claims pursuant to 28 U.S.C. § 1367.

24. By notice dated December 8, 2023, the U.S. Department of Justice Civil Rights Division issued a Notice of Right to Sue which was received on December 8, 2023.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

26. Vannier is a 37-year-old transgender man. He resides in Queensbury, New York.

27. Vannier was employed as a Corrections Officer ("CO") by the DOCCS working out of GMCF from approximately 2012 to August 4, 2022.

28. DOCCS is a department of the New York State government that maintains and oversees the New York State prisons and parole system.

29. GMCF is a maximum-security prison located at 11739 NY-22, Comstock, New York 12821. GMCF houses male prisoners only.

30. DOCCS and GMCF are employers within the meaning of Title VII and the NYSHRL.

## STATEMENT OF FACTS

**Plaintiff Experienced Ongoing Discrimination and Harassment from Coworkers and Supervisors on the Basis of His Gender Identity During and After Transitioning**

31. Vannier was hired as a CO by DOCCS and assigned to work at GMCF in 2012. At that time, he presented as female.

32. Shortly thereafter, in 2013, Vannier began taking testosterone to begin his gender transition to male. At that time, he did not share this information with any other employees of GMCF.

33. In or about the fall of 2013, Vannier informed one of his supervisors, Captain Rod Eastman ("Eastman"), that he was about to undergo the first of several surgeries related to his gender transition. He also told Captain Eastman that he was going to request certain changes, including a transfer from the women's to the men's locker room and an update of his personnel file to reflect his identity as male, not female.

34. Captain Eastman did not just suggest, but actually ordered Vannier to keep quiet about his transition process. He also insisted that Vannier had to wait until his final surgery to request workplace changes such as being given access to the men's locker room.

35. Vannier was not given a reason for denying him the use of a locker room that corresponded with his gender identity.

36. Although Vannier obeyed Captain Eastman's order not to reveal his transition process, it was clear that he was not going to be able to hide his transition as his body changed and his coworkers, particularly new ones, began to notice.

37. From approximately 2015 until 2020, Vannier underwent several surgeries related to his gender transition. Because each of these surgeries required that he take time off to recuperate, many of his fellow officers would ask him what type of surgery he had undergone. This made Vannier uncomfortable as he did not feel he could reveal details about his transition, even though it was becoming increasingly obvious.

38. During this period, Vannier was also not allowed to formally change his gender designation from "female" to "male" in his employment records, even though by 2013, he identified as male.

39. Defendants expressed their transphobic beliefs that Vannier was not a "real man," by refusing to change his personnel file. Upon information and belief,  by refusing to make this change, Defendants were able to continue justify treating Vannier as a woman during his employment and disparaging his male identity.

40. Vannier's discomfort during these years was compounded by the fact that GMCF officials were demanding that he keep his gender identity private; in other words, that he not discuss it, acknowledge it, or come out publicly to his co-workers and supervisors. This prohibition made Vannier feel ashamed and embarrassed.

41. One of the ramifications of having to keep his gender identity private was that Vannier had to continue to use the women's locker room. Locker rooms were used by COs to change into a uniform worn daily.

42. When Vannier used the female locker room after it became clear he was transitioning, his female co-workers and other female staff who also were using the women's locker room told him he was unwelcome there. Specifically, Plaintiff was told that because he was no longer a woman, he should not be using that locker room.

43. At the same time that female co-workers objected to Vannier using the women's locker room, Vannier was forbidden by his superiors from using the male locker room. This left Vannier with no place to change into his uniform when he arrived at work, or to undress and put back on his street clothes at the end of the day.

44. Vannier began arriving at GMCF fifteen minutes earlier each morning, before work officially started, in order to use the female locker room when he was least likely to find someone there. At the end of the day, depending on when his shift ended, he would frequently need to stay an extra 10-15 minutes after his shift was over in order to use this same locker room when others would not be present. This required Vannier to spend an additional 15-30 minutes each day at work.

**Between 2018 and 2022, Plaintiff Was Misgendered by Coworkers and Supervisors on a Nearly Daily Basis**

45. In or about 2018, Vannier finally began telling people at work that he was a transgender man. Beginning then, Plaintiff asked his supervisors and co-workers to refer to him by the pronouns "he" and "him." Regardless, many of these employees refused to use these male pronouns when addressing him and instead continually referred to him as "she" and "her." This behavior continued until August of 2022, when Vannier was constructively terminated from his job with Defendants.

46. Although initially some of the misgendering may have been inadvertent, over time there was no change on the part of other GMCF employees. Many continued to actively and

deliberately misgender Vannier using "she" and "her" pronouns. This misgendering was intentional and done to humiliate Vannier. For instance, when these co-workers used female pronouns referring to Vannier, they said the words "she," and "her" in a disrespectful or mocking tone of voice or used them with other insults directed at Plaintiff because of his transgender status.

47. The constant misgendering made Vannier feel ashamed and degraded at a time when he was trying to establish his identity as a man in his workplace.

48. In addition to creating a hostile work environment for Vannier on the basis of his gender identity, the constant misgendering by Plaintiff's supervisors placed him in potential physical danger at the Facility when he had to strip search incoming prisoners.

49. For instance, when other GMCF employees would refer to Vannier as "she" in front of one or more male prisoners who Vannier had been assigned to strip search, the reaction of most male prisoners was aggressive. Sometimes these prisoners would even react violently. On many occasions, Vannier was called slurs such as "d*ke" by the prisoners he was about to search.

50. Upon information and belief, the reaction of these male prisoners was based on their negative perceptions of Vannier, as a transgender man, seeing them unclothed, and their own prejudices and discomfort with someone who they believed to be a woman, only dressed as a man.

51. The reaction of these prisoners made it much more difficult for Vannier to carry out his assigned job responsibility to search these prisoners because it put him at a safety risk and increased the likelihood that a prisoner would assault him.

52. No matter how much Vannier begged his co-workers and supervisors not to use female pronouns in front of the male incarcerated individuals, they refused to stop, consistently placing Vannier in potential physical danger at the facility.

**Coworkers and Supervisors Ignored and Stopped Speaking with Vannier After He Came Out as a Transgender Man**

53. Additionally, after Vannier officially came out as transgender in or about 2018, some of Vannier's coworkers stopped speaking to him altogether and would not even acknowledge his presence. Being ignored in this manner was humiliating and alienating. Vannier felt excluded, looked down upon, ostracized, and demeaned.

54. For example, Sergeant Pat Hendrix ("Hendrix") had been friendly with Vannier before he came out as transgender in 2018. After he transitioned, Sergeant Hendrix refused to speak with Vannier or even make eye contact. Other than on occasion giving him a direct order, as he was Plaintiff's superior, Sergeant Hendrix did not speak directly or make eye contact with Vannier for the remaining four years he worked at GMCF.

**Coworkers Vandalized Vannier's Locker in the Men's Locker Room Immediately After He was Permitted to Transfer from the Women's Locker Room**

55. In 2018, after Vannier formally came out as transgender, he was finally permitted to transfer to the male locker room.

56. About one week after that reassignment, in the end of February 2018, he found his newly assigned locker in the men's locker room and all of his belongings inside drenched in spit and chewed tobacco.

57. Vannier was upset and disgusted by what his male co-workers had done to his locker. There was no mistaking that this was done to humiliate and degrade Vannier.

**Vannier Encountered Humiliating Graffiti and Slurs in the Male Employees'
Locker Room**

58. Again in 2018, shortly after Vannier came out publicly as a transgender man and was
allowed to finally use the male employees' locker room, he encountered written graffiti on
the partition walls in the bathroom stalls of the employee locker room. Several portions of
the graffiti referred to Vannier by his full name. Next to his name were written derogatory
slurs. These slurs included comments such as "suck[s] dick." Vannier found these
comments to be embarrassing and humiliating.

59. This graffiti outed Vannier to several incarcerated individuals who were asked to clean the
graffiti off the walls. These incarcerated individuals, who knew Vannier's last name, easily
understood the messages on the wall to be about him.

60. News of the bathroom graffiti spread quickly throughout the Facility, and the next day,
several of the incarcerated men screamed homophobic slurs at Vannier, including, "d*ke,"
"f*g**t" and "queer."

61. Contrary to these homophobic slurs, Vannier is not a gay male. Rather, Plaintiff is a
straight male who was at the time in a relationship with a woman. This taunting and
offensive behavior continued from 2018 until Vannier was forced out of his job on August
4, 2022.

**Between 2018 and 2022, Plaintiff Was Harassed by Coworkers and Supervisors on a
Regular Basis**

62. In addition to the constant and persistent misgendering that occurred throughout his
employment with Defendants, Vannier experienced a series of ongoing humiliating and
demeaning incidents at GMCF that were linked to his gender identity and expression. For
example, both coworkers and supervisors often made offensive comments about Vannier's

gender, such as stating or implying that he was not "man enough" to do the job. On several

occasions he was called "c*nt" and told that he was not a "real man." These comments

often happened in the context of receiving an assignment related to handling some of the

more aggressive male incarcerated individuals.

63. Vannier was also regularly told by co-workers and supervisors that being a transgender

man was an "offense to God." For example, on March 3, 2019, CO Kevin Holden

("Holden") sent Vannier a Facebook message saying: "May god forgive you for changing

what he made you," in reference to Vannier's identity as a transgender man.

64. Lieutenant Peter DePalo ("DePalo") was a Staffing Lieutenant at GMFC. His position

involved supervising all of the Sergeants at the Facility. Lieutenant DePalo was

undisputedly Vannier's supervisor.

65. Lieutenant DePalo repeatedly made derogatory comments to Vannier on the basis of his

gender identity, calling him names such as "Add-a-Dick-to-Me" in front of other COs and

other coworkers of Vannier at GMCF.

66. In addition, Lieutenant Danny Mulligan ("Mulligan"), the Watch Commander at GMCF,

who was responsible for prison-wide staffing and operations at the Facility, had generally

been friendly with Vannier before he came out as a transgender man. However, after

Vannier came out in or about 2018, he became hostile toward Vannier. For example, he

would become very aggressive when speaking to Vannier and would refer to him as "biff."

Upon information and belief, "biff" is a slang term that can refer to a vagina.

67. The hostile and belittling comments continued on a near-daily basis for years, until

Vannier's last day working at the prison on August 4, 2022.

**Vannier Was Humiliated and Physically Threatened by CO Eric Ely**

68. On or about August 1, 2021, when Vannier was escorting prisoners to the cafeteria where meals were served to the prisoners, CO Ely confronted Vannier and told him that he was not doing his job correctly. CO Ely was a co-worker and not Vannier's superior. In addition, Vannier had been doing the job of escorting prisoners to the cafeteria for years without any complaint from his supervisors.

69. Instead of pointing out that he disagreed with his co-worker's method of escorting the prisoners, or suggesting a correction, CO Ely flew into a rage and started yelling at Vannier while standing very close to him. He yelled: "You should quit, you should be in prison," and calling him a "c*nt" more than once. Vannier was shocked and upset by the use of the "c" word by his co-worker.

70. After yelling these epithets at Vannier, CO Ely moved quickly and aggressively even closer toward Vannier. Vannier was not sure what was happening but feared that CO Ely might attack him. To protect himself, Vannier fled CO Ely's reach and ran up a flight of steps. CO Ely followed, continuing to yell the word "c*nt" over and over again, until he finally stopped coming up the stairs after him.

71. Vannier finally reached another floor. He was breathing heavily and extremely distressed by the verbal and almost physical attack.

**Plaintiff Applied for and Was Discriminatorily Denied a Relief Position in 2018**

72. In or about January 2018, after he had come out as transgender, Vannier applied for a "Relief Position" at GMCF. A "Relief Position" is one in which an employee at the Facility would cover assigned shifts when other officers took time off.

73. Job duties for the Relief Position for which Vannier applied, included escorting incarcerated individuals to various places around the Facility, checking the identification of staff and visitors entering and exiting the Facility in the front lobby, and processing incarcerated individuals and visitors in and out of the room used for conjugal visits as part of the Family Unification Program.

74. In February 2018, Vannier learned that he had been denied this transfer. He was later told by Lieutenant DePalo that the Relief Position for which Vannier had applied was a "male-only" position and that Vannier had been denied the position because he "was not a man."

75. In fact, there were no gender specifications for the job, and there was no basis for making this a "male-only" position. Female COs could and would in the past handle all duties related to the Relief Position for which Vannier was applying.

76. In addition, Vannier was fully capable of performing the duties asked of anyone assigned to this Relief Position. Instead, the position was given to a non-transgender male with less seniority, in violation of the Collective Bargaining Agreement ("CBA").

**Plaintiff Filed a Grievance with His Union Due to Discriminatorily Being Denied a Transfer**

77. Following the denial of this transfer request, Vannier filed a grievance with his union, the New York Correctional Officers and Police Benevolent Association (the "Union"), on April 18, 2018.

78. Vannier was ultimately awarded the Relief Position by the Union in or about September 2018, making clear that he was fully capable of assuming the duties related to this position.

79. For the next year, that is, from about September 2018 through to September 2019, Vannier continued to work in this Relief Position.

14

**While Vannier Was Working in the Relief Position from September 2018 to September 2019, Lieutenant DePalo Repeatedly Insulted and Belittled Vannier on the Basis of His Gender Identity**

80. Throughout the period of time when Vannier held the Relief Position, Lieutenant DePalo continued to make demeaning comments about Vannier's gender identity, such as "you are not a real man," or refer to him as "Add-a-Dick-to-Me."

81. Many of Vannier's coworkers would overhear Lieutenant DePalo's belittling taunts and laugh. These words were hurtful, humiliating, and degrading to Vannier's sense of self and to his gender identity as a man.

82. Lieutenant DePalo also sought other ways to disrupt Vannier's workday and humiliate him. For example, Vannier was required to take one of the prisoners around at the end of the day to collect the trash from the offices in the Facility. Nearly every day, Lieutenant DePalo would call Vannier on the telephone from his office while Vannier was in the front lobby, demanding that he come and pick up his office trash – even though it was not yet time for this daily trash pickup.

83. When Vannier pointed out that he was otherwise engaged with other job duties, and that he would escort a prisoner to pick up his trash at the end of the day, Lieutenant DePalo would say, "if you want to be a man, you should do your job." Or if Vannier did not respond to his request to drop everything and pick up Lieutenant DePalo's trash – and his alone – he would taunt Vannier and tell him he was "not a man."

**Vannier Raised Complaints with His Union About the Gender-Based Harassment by Lieutenant DePalo, but the Harassment Did Not Stop**

84. In or about August 2019, Vannier asked his Union Representative to set up a meeting between him and Lieutenant DePalo, so that Vannier could formally speak to him about the

constant harassment and ask him to stop. A meeting was subsequently scheduled between Vannier, his Union Representative, and Lieutenant DePalo.

85. During that meeting, Lieutenant DePalo would not even let Vannier speak. Instead, he kept talking over him, and addressing his comments only to the Union Representative. When speaking to this representative, Lieutenant DePalo chided and mocked Vannier, saying: "This is what happens, 'she' is going to press charges on me, you know where this is going, I shouldn't even be in this room right now." As Lieutenant DePalo uttered these words, he deliberately, and with a sarcastic tone of voice, emphasized the word "she," even though Vannier had repeatedly told him that he used male pronouns.

86. Lieutenant DePalo did not stop or decrease his constant harassment of Vannier after this meeting.

**Plaintiff Experienced Gender-Based Harassment from Supervisors that Affected His Evaluations and Work Assignments at GMCF**

87. Sergeant Claudia Collins ("Collins") held various positions at the Facility and worked in close proximity to Vannier from nearly the beginning of his employment at GMFC. In 2018, she became Vannier's direct supervisor.

88. When Vannier still appeared outwardly more feminine and still used feminine pronouns Sergeant Collins had always been pleasant and respectful to Vannier when they worked together,

89. However, in or about 2018, when Vannier came out as a transgender man, Sergeant Collins' attitude about and treatment of Vannier changed. She not only seemed hostile toward Vannier but she would intentionally and maliciously misgender Vannier and make transphobic comments on a regular basis.

90. This hostility more directly impacted Vannier beginning in or about September 2018, when Plaintiff began working directly under Sergeant Collins in the Relief Position. At that time, he asked Sergeant Collins to use male pronouns when addressing and/or referring to him. Sergeant Collins, however, continued to misgender Vannier. On more than one occasion she yelled at him and said: "Don't tell me what the fuck to do!"

91. On or about June 12, 2019, after Vannier had complained multiple times about her misgendering him, Sergeant Collins downgraded Vannier's 2019 evaluation, which covered the period of June 2018 to June 2019.

92. In Vannier's prior annual evaluation, from June 2017 to June 2018, he had received a rating of "excellent." Sergeant Collins gave him a rating of "good" in his 2019 evaluation.

93. Vannier complained about Sergeant Collins' 2019 evaluation to Lieutenant Collins' superior, Captain Rick Vladyka ("Vladyka").

94. Captain Vladyka told Vannier that he believed Sergeant Collins's review was an inaccurate judgment of his work performance and referred the evaluation to another Sergeant, Sergeant Bill Granger ("Granger") who subsequently changed Vannier's evaluation to "Excellent" in all aspects of his work.

95. Sometime in 2022, Vannier checked his personnel file and did not see his 2019 performance review written by Sergeant Granger. After noticing this gap and worrying that it could impact him negatively in his career with Defendants, Vannier asked GMCF to add the missing performance review to his file. However, it was never added.

**Vannier's Employment Records Were Never Changed to Reflect His Gender**

96. In April of 2021, upon Vannier's request, Captain Colin Frasier ("Frasier") contacted the director of the DOCCS personnel office in Albany to ask to change Vannier's personnel file to reflect that he now identified as a man.

97. Defendants refused to change Vannier's personnel records to reflect his male identity. Captain Frasier told Vannier that the personnel office refused his request, stating that the DOCCS office in Albany had written in an email: "We don't do that. That is how she [sic] came into the department and it stays that way."

98. Defendants' response to Vannier's request was humiliating and deeply upsetting to Vannier, whose gender identity was male. Upon information and belief, it also set the tone at GMCF for how Vannier's gender and gender identity were viewed; that is as female not male.

99. Consequently, on or about April 29, 2021, Vannier filed a complaint with his Union, who on Plaintiff's behalf requested once again the update of his gender identification in his personnel file. However, the DOCCS never changed his personnel record.

**Vannier Applied for a Property Room Position in 2019 to Escape the Harassment**

100. In or about 2019, Vannier applied for a full-time job in the Facility's Property Room. The Property Room is where prisoner's personal belongings were kept and stored.

101. This position would allow Vannier to work mostly alone, with just one other officer. Vannier believed the relative seclusion of this position would allow him to distance himself from the regular deluge of offensive comments and misgendering he was experiencing from his co-workers and supervisors, as well as some prisoners.

**The Stress and Emotional Impact of Working in a Hostile Work Environment Took its Toll on Vannier**

102. Vannier obtained the Property Room position in or about September 2019.

103. However, despite his hope that the gender-based harassment would end or be significantly reduced, it still continued during those limited periods of time when he was required to step out of the Property Room.

104. For instance, while working in the Property Room, Vannier was still responsible for escorting prisoners to the cafeteria for meals and standing guard while they ate their meals. During these time periods, co-workers and supervisors continued to harass and misgender Vannier on a regular basis.

105. In addition, even while working in the property room, Vannier still had to work with coworkers CO Dodge and CO Fletcher on a regular basis while escorting prisoners to the cafeteria. Both of these coworkers would misgender Vannier regularly and would always refer to him as "she" and "her" in a mocking tone of voice. At this point in his employment, Vannier had been requesting that his coworkers and supervisors use his male pronouns for years.

106. Vannier continued to plead with his co-workers not to refer to him by female pronouns. However, they ignored him and after hearing these requests would laugh at Vannier and walk away. Sometimes they just repeated the female pronouns, which was clearly done to humiliate and disrespect Vannier's status as a transgender man.

107. In addition, during this period of time, CO Dodge and CO Fletcher, as well as other GMCF staff, would also regularly insult Vannier by telling him that he "wasn't a man," that his "shit" was handmade (referring to his genitals and the fact that he received gender-affirming surgery), and that "he had a girl's DNA and no one could change that." These

comments were frequently made in front of multiple incarcerated individuals, who would then refer to Vannier with slurs such as "d*ke" and become more confrontational with him while he was working with them.

108. In addition, during this period of time, Lieutenant DePalo would continue to make belittling taunts at Vannier, directly attacking his gender. These comments included calling him "Add-a-Dick-to-Me" and telling Plaintiff he was "not a real man." These words were humiliating, and degrading to Vannier's sense of self and to his gender identity as a man. Co-workers who overheard Lieutenant's insults would often laugh, furthering Plaintiff's humiliation.

109. Beginning in or about September 2019, after his transfer to the Property Room job, Vannier became increasingly anxious due to the hostile environment at GMCF.

110. During this period of time Vannier's blood pressure became increasingly high. Before this time period, Vannier had no history of high blood pressure.

**Sergeant Hamel's Unsubstantiated Verbal Tirade Against Vannier on April 25, 2021**

111. On April 25, 2021, without any warning, Sergeant Hamel pulled Vannier out of the Property Room and brought him down to the Sergeants' interview room with another Sergeant, Sergeant Moore. Sergeant Hamel was overseeing a different cell block than the one Vannier was working in that day.

112. Once in the room with the other sergeant and Vannier, Sergeant Hamel began screaming at Vannier in a very loud voice, stating over and over again that he "wasn't doing his job," and that his partner did "ten times more work than him." Not only did Sergeant Hamel criticize Vannier's work performance, but he also called him "an asshole," and a "piece of s*it."

113. Vannier had never heard Sergeant Hamel yell or use that kind of profanity with any other GMCF employee.

114. Although Sergeant Hamel did not make any gender-related remarks during this out-of-control tirade, Sergeant Hamel had previously made his views known to Vannier about his transitioning. Specifically, Sergeant Hamel had made comments such as "I don't like you and I don't believe in what you did," in reference to his gender transition.

115. Vannier felt so threatened by the out-of-control manner in which Sergeant Hamel screamed at him on April 25, 2021, that his heart began racing and he immediately sought out medical attention from the medical office at GMCF. Individuals in that office advised him to seek out further medical attention.

116. On or about April 26, 2021, Vannier went to his doctor. His doctor advised him that his high blood pressure made it dangerous for him to be at work and ordered him to stay home for the next nine days.

117. Upon Vannier's return to work in May of 2021, he attempted to keep his anxiety and mental distress under control, although the pervasive hostility toward him at the Facility on the basis of his being a transgender man did not let up.

**The Gender-Based Harassment Continued, Causing Vannier to Suffer a Heart Attack in February 2022**

118. Vannier continued to face constant harassment by incarcerated individuals as well as staff in late 2021 and early 2022. For example, incarcerated individuals would make comments about Vannier's gender identity on a daily basis, such as "you are not a man." This made it difficult to do his job, especially when performing strip frisks, because these prisoners were more likely to try to assault him due to their clear discomfort with him because he was a transgender man.

119. Vannier also observed that other GMCF employees condoned transphobic comments and behavior between the prisoners. Frequently, COs and other prison staff would not intervene until this transphobic harassment escalated to a violent confrontation, which Vannier witnessed on several occasions. Witnessing these gender-based prisoner-on-prisoner assaults was extremely distressing to Vannier and contributed to the significant amount of stress he experienced on the job.

120. On February 8, 2022, Vannier suffered a heart attack. At that time, he was 35 years old and had no history of heart problems.

121. Because of this heart attack, Vannier was required to go out on a mandatory medical leave for approximately one month.

122. Given time to rest and to be away from the discriminatory and hostile environment Vannier had been forced to work in, Vannier was able to recuperate from his heart attack and his blood pressure went down.

123. In March of 2022, Vannier's doctor cleared him to return to work at GMCF, and specifically to the Property Room position he had previously held there at the Facility.

124. Upon his return to the GMCF, Vannier tried to use the relative safety of the Property Room assignment to continue to work at the Facility.

125. During this period of time, Vannier was still regularly misgendered by Lieutenant DePalo, among other supervisors and on a nearly daily basis from co-workers when he conducted activities outside of the Property Room.

**Defendants' LGBTQ Anti-Discrimination Trainings Not Only Failed to Correct the Hostile Work Environment Vannier Was Forced to Endure While Working at GMCF, but Actually Furthered the Harassment**

126. As far as Vannier was aware, GMCF conducted a yearly training aimed at preventing discrimination at the prison. Each year, the training was given by an individual who worked for GMCF, and 10-15 officers would be trained at a time. The trainings were supposed to take place in a building across the street from the Facility.

127. Instead of educating the GMCF workforce about how not to discriminate against LGBTQ+ individuals within the prison community, Vannier witnessed that GMCF staff present at the hearing would laugh at the presentation. The reaction of these officers was humiliating and belittling for Vannier and presumably for any other LGBTQ+ staff members who attended these trainings.

128. On at least one occasion, the annual LGBTQ+ training offered by Defendants was conducted in front of the incarcerated individuals, rather than in a more private part of the prison where only employees would attend, or in the building across the street from the jail. Upon information and belief, this was contrary to Defendants' own policy.

129. Each time this training was done, it was as if the training was specifically about Vannier and other LGBTQ+ staff members, and it outed Vannier to anyone who did not previously know he was transgender. For example, the trainer would discuss transgender people and then directly ask Vannier if he explained it correctly.

130. Other LGBTQ+ employees were also treated this way, and one of Vannier's coworkers who identifies as a lesbian told him that after these trainings, other officers would hit on her in an attempt to "make her straight."

131. These trainings obviously did not prevent or even lessen the anti-LGBTQ+ harassment that was pervasive throughout GMCF. In fact, they added to the hostile work environment that Vannier experienced by humiliating him and further outing him as transgender to anyone who did not previously know about his gender identity.

**Vannier Was Unilaterally Transferred to a New Position and Placed in an Uninhabitable Workspace**

132. On or about August 4, 2022 – during the morning lineup, when officers report for roll call and check ins – Sergeant Hendrix, a supervisor, told Vannier that his job in the Property Room was ending effective immediately. Sergeant Hendrix told Plaintiff that he would immediately be reassigned. Plaintiff was not, however, told to what position he would be transferred.

133. Vannier was not given any explanation for this move, nor any advance notice. This sudden removal of Vannier from his job was in direct contradiction to the normal protocols dictated by DOCCS and utilized by GMCF for transfers. DOCCS protocols required advance notice of any transfer within GMCF and the presentation of a job description to the potential transferee for them to review before being moved.

134. Instead, Sergeant Hendrix instructed Vannier to escort a group of general population prisoners into an area where protective custody prisoners were housed.

135. Because Vannier had worked at GMCF for many years, he was acutely aware that mixing these two populations was dangerous and therefore prohibited by DOCCS' own rules. In fact, during the ten years that he had worked at the Facility, Vannier had never heard of any other GMCF employee being assigned to escort a mixed population of prisoners.

136. Vannier explained his safety concerns to Sergeant Hendrix and his understanding of this prison's prohibition on mixing these two populations.

137. Sergeant Hendrix refused to listen to Vannier's safety concerns and told him to follow his order without questioning him.

138. Soon after, Sergeant Lovely, a subordinate of Lieutenant Mulligan, told Vannier that Lieutenant Mulligan was ordering Vannier to work out of a room located in the back part of an area of the Facility not previously used; and once he reported to that room, to create activity logs of the whereabouts of certain prisoners. Lieutenant Mulligan was the Watch Commander, who had been hostile to Vannier since he came out as transgender.

139. As soon as Vannier stepped into the assigned room, he was shocked. The floors, walls, and furniture in this room were covered in bird feces. There was no running water and no usable bathroom. There was a clear insect infestation, black mold on the walls, and human feces on the floor. In addition, Vannier did not have access to a chair or a desk, as both were covered in bird feces and stored in a backroom.

140. After seeing the condition of the room, Vannier went back to Sergeant Hendrix and complained about being assigned to a workspace that was clearly uninhabitable.

141. Sergeant Hendrix showed complete indifference to Vannier's complaint or description of the uninhabitable conditions of the room to which he had been assigned. Upon information and belief Sergeant Hendrix was already aware of the sub-human conditions of the room about which Vannier was complaining. Instead, he simply told him to "just do your job."

142. Despite Sergeant Hendrix's order for Vannier to do his job, it would have been impossible for him to do so. There was no logbook to keep track of prisoner activity, no telephone to communicate with other staff, and no other officer assigned to work alongside him.

143. After inspecting the room, Vannier requested a "Photo Officer" (an officer used to document prisoner injuries, contraband, and other related issues and objects at the Facility)

to take pictures of the room in question and the deplorable working conditions he was being forced to endure if he inhabited it.

144. Vannier then filed a complaint with his Union representative.

145. Shortly thereafter, that same day, Vannier was told by Union Representative Charlie Parrara ("Parrara") that Lieutenant Mulligan, who had assigned Vannier to work in this room, had threatened his employment; that is, Lieutenant Mulligan had told Parrara that if Vannier escalated his grievance, he would never be considered for any other job at GMCF.

146. At some point that day, between around 11:00am and 12:00pm, Vannier became paralyzed with anxiety at the thought of being forced to work in an uninhabitable room. Vannier felt so beaten down by years of abuse on the basis of his gender identity and being told his gender identity was abnormal, that assigning him to this room made him feel less than human.

147. That afternoon, Vannier suffered a severe panic attack and was forced to go to the Facility Hospital for care. At this time, his heart was racing, he felt dizzy, he had chest pain, and he was almost out of breath, as if he was having another heart attack.

148. When Plaintiff left work on August 4, 2022, Vannier called in sick on "will call," which means that an officer will call back when they are well enough to return to work.

149. The following day, August 5, 2022, Vannier sought medical attention from his doctor, who advised him not to return to work. He has not returned to work since then.

**Plaintiff Has Been Unable to Return to Work Since August 5, 2022**

150. Since August 5, 2022, Vannier has been out of work on a medical leave. Due to his psychological injuries, he has been unable to work.

151. Since August 2022, Vannier has filed three separate complaints for gender discrimination and retaliation with the Office of Employee Relations Anti-Discrimination Investigation Division. Upon information and belief, Defendant has not made a meaningful investigation into Vannier's discrimination claims.

**Employees of Defendant Continue to Harass and Retaliate Against Plaintiff on the Basis of His Gender Even After He Left GMCF**

152. On October 9, 2023, Vannier and his wife, Lindsey Vannier ("Ms. Vannier"), were at a local bar in Glens Falls, NY. Glens Fall is approximately 15 miles from Comstock, where GMCF is located.

153. Ms. Vannier works part-time in this bar. On that day, an individual named Roy Mascal ("Mascal), a retired GMCF CO and Vannier's former coworker, saw Vannier with his wife.

154. About one week later, Vannier learned from a regular customer at the bar that Mascal had returned on October 11, 2023 and told everyone in the bar who would listen that Vannier is transgender. Mascal also told employees there that Ms. Vannier should be fired from her part-time bartending job because her husband is transgender.

155. Upon information and belief, Mascal is currently receiving a pension from New York State.

**Effects of Defendants' Discrimination on Plaintiff**

156. Since being placed on medical leave following his anxiety attack on August 4, 2022, Vannier has been under the treatment of a psychiatrist who has diagnosed him with Post Traumatic Stress Disorder ("PTSD").

157. In September of 2022, he began taking anti-anxiety medication to treat his PTSD symptoms. He continues to take this medication to this date.

158. Vannier is also in psychotherapy with a psychologist for treatment of symptoms related to his PTSD diagnosis.

159. This debilitating psychological injury has rendered Vannier unable to return to his position at GMCF, resulting in the termination of his employment and benefits.

160. Vannier continues to be under medical treatment related to his heart attack and mental health treatment for PTSD.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS
### (Gender-Based Discrimination in Violation of Title VII)

161. Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

162. By the acts and practices described above, Defendants unlawfully discriminated against Plaintiff in the terms and conditions of his employment, including creating and permitting to exist an abusive and hostile work environment and the loss of employment-related benefits, on the basis of his gender identity which continued through his last day of work with Defendants.

163. Defendants' discriminatory acts caused Plaintiff to be constructively discharged, resulting in the loss of pay and job-related benefits. These losses continue until today.

164. Defendants' discriminatory acts caused Plaintiff to suffer severe emotional distress, including but not limited to humiliation, shame, anxiety, depression, PTSD, high blood pressure, and a heart attack.

165. Defendants acted with malice and reckless indifference to Plaintiff's rights under Title VII.

166. Defendants are liable to Plaintiff for lost pay and work-related benefits, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs.

### SECOND CAUSE OF ACTION AGAINST DEFENDANTS
### (Gender Identity Discrimination in Violation of NYSHRL § 296)

167. Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

168. By the acts and practices described above, Defendants unlawfully discriminated against Plaintiff in the terms and conditions of his employment, including creating and permitting to exist an abusive and hostile work environment and in depriving Vannier of employment-related benefits on the basis of his gender identity.

169. Defendants' discriminatory acts caused Plaintiff to ultimately be constructively discharged, leading to the loss of wages and job-related benefits.

170. Defendants' discriminatory acts caused Plaintiff to suffer severe emotional distress, including but not limited to humiliation, shame, anxiety, depression, PTSD, high blood pressure, and to suffer a heart attack.

171. Defendants acted with recklessness amounting to a conscious disregard of Plaintiff's rights under the NYSHRL.

172. Defendants are liable to Plaintiff for emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment:

(a)   Declaring that by the acts and practices complained of herein, Defendants have violated Title VII and the NYSHRL;

(b)   Issuing an Order and Injunction directing DOCCS to remedy its policies and practices to comply with Title VII and the NYSHRL;

(c)   Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect Plaintiff's or future employees' employment opportunities;

(d)     Awarding Plaintiff compensatory damages for lost wages and benefits, mental anguish, emotional distress, and humiliation as relates to Defendants' discriminatory conduct in violation of Title VII and the NYSHRL;

(e)     Awarding Plaintiff punitive damages as relates to Defendants' malicious and willful or wanton negligence, or recklessness, or conscious disregard of Vannier's legal rights under Title VII and the NYSHRL;

(f)     Awarding Plaintiff pre- and post-judgment interest;

(g)     Awarding Plaintiff costs and reasonable attorneys' fees; and

(h)     Granting Plaintiff such other and further relief as this Court deems necessary and proper.

Dated:  Brooklyn, New York
March 6, 2024

GENDER EQUALITY LAW CENTER

By:     Allegra L. Fishel
157 13th Street
Brooklyn, New York 11215
(347) 844-9003 Ext-1
afishel@genderequalitylaw.org
*Attorney for Plaintiff*